IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SQUARE D COMPANY and SCHNEIDER ELECTRIC, S.A., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO.:  07 C 6294 ) |
| ELECTRONIC SOLUTIONS, INC., and WILLIAM AMBROS, | ) Judge James B. Moran ) ) |
| Defendants. | ) ) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Square D Company ("Square D") and Schneider Electric, S.A. ("Schneider") (collectively "Plaintiffs") submit this memorandum of law in support of their Motion for Preliminary Injunction against Defendants Electronic Solutions, Inc. and William Ambros (collectively, "Defendants").

## INTRODUCTION

Square D is the North American operating division of Schneider Electric, and is a world leader in the manufacture and distribution of a wide variety of commercial and consumer electrical distribution products and devices.  Schneider Electric is also recognized as a world leader in the manufacture and distribution of a wide variety of commercial and consumer electrical distribution products and devices, including TELEMECANIQUE® electrical contactors.  Plaintiffs have direct evidence that ESI, a distributor of electrical equipment, has distributed and sold counterfeit contactors bearing trademarks owned by Plaintiffs.

Counterfeit contactors pose serious fire and electrical shock hazards to innocent consumers.  Unless Defendants are enjoined from selling electrical components bearing

Plaintiffs' trademarks until such time as Plaintiffs have inspected the electrical components in Defendants' possession that bear Plaintiffs' trademarks to identify those that are counterfeit, illegal and potentially dangerous electrical components will continue to be sold. Injunctive relief is required to protect Plaintiffs' trademark rights and innocent residential consumers from the dangers of counterfeit electrical components.

## FACTS[1]

Square D is the North American operating division of Schneider Electric, and is a world leader in the manufacture and distribution of a wide variety of commercial and consumer electrical distribution products and devices. Among Square D's wide product range are circuit breakers, contactors, relays, electric panels, and switches. The SQUARE D trademark – a square circumscribing a square-shaped "D" – is universally recognized throughout the United States as an identifier of quality Square D products and is registered with the U.S. Patent and Trademark Office (since 1926) under Registration Number 215,776.

Schneider Electric is also recognized as a world leader in the manufacture and distribution of a wide variety of commercial and consumer electrical distribution products and devices. Schneider Electric holds several trademarks, including the SCHNEIDER ELECTRIC® trademarks and the TELEMECANIQUE® mark. The SCHNEIDER ELECTRIC® and TELEMECANIQUE® trademarks are universally recognized throughout the United States as an identifier of quality Schneider Electric products and are registered with the U.S. Patent and Trademark Office under Registration Numbers 2,424,546 and 2,491,767. 1,049,948.

Square D distributes Square D, Telemecanique and Schneider Electric products nationally and internationally through a network of independent authorized distributors. All of

---

[1] The facts set forth herein were acknowledged and sworn to in the verification to the Complaint filed in this action.
1843632-2

2

Square D's distributors, including the distributors for the territory encompassing this District and the State of Illinois, sign distributorship agreements. The distributors agree to sell authentic Square D, Telemecanique and Schneider Electric products to customers at competitive prices and to maintain sufficient inventory of Plaintiffs' products to ensure prompt and reliable service to the customer or end-user. Square D's distributorship policies and agreements prohibit authorized distributors from selling Square D's products to unauthorized distributors or wholesalers, such as ESI or Ambros. Square D's distributors may sell only to electrical contractors, industrial accounts, utilities, original equipment manufacturers, or other end-users.

The sale of electrical components is highly competitive among manufacturers and distributors. Because of the similarity in function of many electrical components, consumers have a choice in manufacturer of particular items. The reputation of the manufacturer and its distributors, therefore, is vital to the continued economic success of manufacturers of electrical distribution products. Given the competitive environment, it is crucial for Plaintiffs to maintain their reputation of providing high quality products at competitive prices as well as excellent service and availability of product, both directly and through its distributors.

Among Plaintiffs' products are the TELEMECANIQUE® line of electrical contactors. A contactor is an electrical relay used to switch a large amount of electrical power through its contacts. Contactors typically have multiple contacts and those contacts are usually (but not always) open, so that power to the load is shut off when the coil is de-energized. The most common industrial use for contactors is the control of electrical motors. Defective and counterfeit contactors can pose serious risks, including property damage, personal injury and destruction of motors controlled by the contactor. (*See* the Affidavit of Jeff A. Miller, submitted herewith as Exhibit B, at ¶ 6).

**Counterfeit Contactors and Their Threat to Public Safety**

Over the past decade, the counterfeiting of electrical components has increased dramatically. The counterfeit contactors imported and sold by ESI and Ambros bear the TELEMECANIQUE®, SCHNEIDER ELECTRIC® and SQUARE D® trademark symbols and appear to have the same overall configurations of genuine Square D and Schneider Electric products. Upon information and belief, the counterfeit contactors are manufactured in China and then imported into the United States. (See Jianxi Sunhong Electric website at http://www.cnmcb.com).

When counterfeit contactors are installed and subjected to an electrical load, their poor interior quality and inauthentic nature can lead to serious consequences. (Miller Affidavit, Ex. B, at ¶ 6). The counterfeit contactors sold by defendants were found to have inferior plastic, plastic moldings, contact material, improper hardware and assembly errors. (*Id.* at ¶ 5). These defects carry a risk of shortened electrical life, melting and/or jamming causing motor or load to not shut off, and can lead to an electrical breakdown causing a short circuit. (*Id.* at ¶ 6). The defective nature of counterfeit contactors can cause the contactor to overheat, catch fire and/or explode. *Id.* Anyone near one of the contactors when it explodes could be injured. If the contactor does not explode, it may nonetheless fail to protect or control the apparatus or motor it was installed to protect or control. *Id.* Because counterfeit electrical parts are a genuine threat to consumer safety and, by extension, threaten the good reputation and value of the SQUARE D® and SCHNEIDER ELECTRIC® marks, Plaintiffs vigorously defend their marks and consumers from the hazards posed by counterfeit products.

**ESI Sells Counterfeit Square D and Schneider Electric Products**

Neither ESI nor Ambros has an affiliation with either Square D or Schneider Electric, and neither are authorized to sell any of Square D or Schneider Electric's products. On information and belief, during the past several months, ESI and Ambros have sold hundreds of counterfeit Square D, Telemecanique and Schneider Electric parts. Among other sales, ESI and Ambros sold approximately five electrical contactors on or about July 11, 2007, all of which were represented to be authentic. Inspection of these contactors confirmed that two of the five were counterfeit. In this manner, Defendants co-mingled the counterfeit contactors with outdated, authentic contactors to disguise the counterfeit ones. Specifically, on July 11, 2007, ESI and Ambros sold five (5) electrical contactors bearing the TELEMECANIQUE®, SQUARE D® and SCHNEIDER ELECTRIC® marks to Tsutomu Shimomura. (Copies of the invoice and related documents for the sale are attached as Exhibit A).

Suspecting the contactors were not authentic, Mr. Shimomura shipped them to Square D on July 19, 2007. Square D inspected the contactors and discovered that two (2) of the five (5) contactors were counterfeit. (A copy of the report of Mr. Jeff Miller, Senior Engineer at Square D, is attached hereto as Exhibit B). At all relevant times, ESI and Ambros intentionally and deliberately sold counterfeit Square D, Telemecanique and Schneider Electric parts, and knew or should have known that the parts they purchased and sold were counterfeit. ESI and Ambros knew they were not an authorized distributor of Square D, Telemecanique or Schneider Electric products and did not lawfully purchase the parts from Square D or one of its authorized distributors.

Notwithstanding this knowledge, ESI and Ambros marketed and represented to customers and potential customers that the products were authentic Square D, Telemecanique

and Schneider Electric products. Neither ESI nor Ambros ever informed customers or potential customers that, in fact, they stocked and sold counterfeit Square D and Schneider Electric products.

Based upon ESI and Ambros's sale of counterfeit Square D and Schneider Electric products, Plaintiffs have suffered irreparable harm to their reputation and goodwill. Moreover, an innocent consumer present when a counterfeit product fails to work correctly may suffer devastating property damage or the ultimate irreparable harm, personal injury, or death. Plaintiffs have also lost profits that they would have earned through the sale of authentic products through an authorized distributor but for ESI's unlawful distribution of counterfeit products.

### Argument

A preliminary injunction is warranted if Plaintiffs establish (1) a likelihood of success on the merits; (2) that they have no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied; (3) that the irreparable harm they will suffer without injunctive relief outweighs the irreparable harm that Defendants will suffer if the injunction is granted; and (4) the public interest is served by the injunction. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). The available evidence readily establishes each of these factors and weighs heavily in favor of this Court granting the preliminary injunctive relief requested by Plaintiffs.

I. **Plaintiffs Will Succeed on the Merits of Their Claims.**

Preliminary injunctive relief requires proof of a "reasonable likelihood" of success on the merits of the claim. *Platinum Home Mortgage Corp. v. Platinum Financial Group*, 149 F.3d 722, 726 (7th Cir. 1998). It cannot be disputed that Defendants sold counterfeit electrical

contactors bearing Plaintiffs' trademarks to Tsutomu Shimomura in July 2007. Defendants' infringement of Plaintiffs' trademark rights has been conclusively established. (See the invoices between Defendants and Tomatsu Shimomura, Ex. A, and the Report of Jeff Miller, Ex. B-1). Additional discovery is not required to determine whether there is a reasonable likelihood that Square D will succeed on the merits of its claim. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988).[2]

Section 1114(1) of the Lanham Act states in pertinent part:

(1)    Any person who shall, without the consent of the registrant—

(a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

Defendants' sale of counterfeit electrical contactors bearing Plaintiffs' trademarks to Tsutomu Shimomura violates Section 1114(1) of the Lanham Act. The evidence presently before the Court establishes a substantial likelihood that Plaintiffs will prevail on the merits of its claim.

---

[2] Additional discovery would, of course, reveal the full and repeated scope of Defendants' violations of the Lanham Act.

1843632-2

7

contactors bearing Plaintiffs' trademarks to Tsutomu Shimomura in July 2007. Defendants' infringement of Plaintiffs' trademark rights has been conclusively established. (See the invoices between Defendants and Tomatsu Shimomura, Ex. A, and the Report of Jeff Miller, Ex. B-1). Additional discovery is not required to determine whether there is a reasonable likelihood that Square D will succeed on the merits of its claim. *See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988).[2]

Section 1114(1) of the Lanham Act states in pertinent part:

(1)    Any person who shall, without the consent of the registrant—

(a)    use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

Defendants' sale of counterfeit electrical contactors bearing Plaintiffs' trademarks to Tsutomu Shimomura violates Section 1114(1) of the Lanham Act. The evidence presently before the Court establishes a substantial likelihood that Plaintiffs will prevail on the merits of its claim.

---

[2] Additional discovery would, of course, reveal the full and repeated scope of Defendants' violations of the Lanham Act.

**II.   Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm Unless the Injunction is Granted.**

Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods. *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983). Indeed, "[t]he Seventh Circuit has frequently acknowledged the well-established presumption that injuries arising from Lanham Act violations are by their very nature irreparable and not susceptible to an adequate measurement for a remedy at law." *Morton Grove Pharmaceuticals, Inc. v. The National Pediculosis Association, Inc.*, 2007 U.S. Dist. LEXIS 88040 at *28 (N.D. Ill. 2007); *see also Abbott Laboratories v. Mead Johnson Company*, 971 F.2d 6, 16 (7th Cir. 1992); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1091 (7th Cir. 1988). "'The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.'" *Int'l Kennel Club of Chicago, Inc.*, 846 F.2d at 1092 (quoting *Ideal v. Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1026 (7th Cir. 1979)). The loss of goodwill or customers justifies the entry of a preliminary injunction. *See Abbott Laboratories v. Mead Johnson Company*, 971 F.2d 6,16 (7th Cir. 1992); *Morton Grove Pharmaceuticals, Inc. v. The National Pediculosis Association, Inc.*, 2007 U.S. Dist. LEXIS 88040 at **27-28 (N.D. Ill. 2007).

Irreparable harm may also be shown by demonstrating a potential danger to the health and safety of a movant's customers. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998) (finding McDonald's suffered irreparable harm to its reputation by losing customers as a result of the defendants' distribution of an allegedly inferior and possibly dangerous product

held out as a McDonald's product); *see also, In re Establishment Inspection of Skil Corp.*, 846 F.2d 1127, 1134 (7th Cir. 1988)(holding risk that manufacturer was manufacturing a dangerously defective circular saw warranted granting of injunctive relief); *Eagle Marine Industries v. Union Pacific Railroad*, 363 Ill. App. 3d 1166, 1169 (5th Dist. 2006)(upholding permanent injunction prohibiting obstruction of road where obstruction would have compromised public health and safety and plaintiffs would have suffered irreparable harm).

As set forth in the Miller Affidavit, the counterfeits at issue are of poor quality and pose dangers to innocent consumers. (Miller Affidavit, Ex. B, at ¶¶ 5-6). Allowing Defendants to continue to sell and distribute counterfeit Square D and Schneider Electric products will deprive Plaintiffs of control over the nature and quality of its products. Plaintiffs will not only also suffer substantial, incalculable damage to its goodwill and customer base, but due to the inferior quality of counterfeit circuit breakers and the substantial threat they pose to consumers, substantial damage to Plaintiffs' reputation is likely as well. *Id.* No monetary amount can adequately remedy the irreparable damages that Plaintiffs' will suffer in the absence of injunctive relief.

### III. The Irreparable Harm to Plaintiffs' Goodwill and Consumer Safety Outweighs Whatever Harm the Proposed Injunction May Cause Defendants.

The injury, existing and potential, to Plaintiffs' goodwill and reputation along with the impact to Plaintiffs' ability to control the nature and quality of its products and the threat to consumer health and safety far outweigh any conceivable harm to Defendants if preliminary injunctive relief is granted. Plaintiffs have established that Defendants have, as recently as November 2006, purchased, sold and, unless restrained, will continue to sell counterfeit Square D and Schneider Electric products. This proof alone justifies preliminary injunctive relief. Defendants have no legitimate interests which will be harmed by entry of a preliminary injunction temporarily halting its sale of electrical components bearing Plaintiffs' trademarks

until its inventory can be inspected for the presence of counterfeit products. Entry of the requested injunction therefore will impose minimal, if any, hardship on Defendants.

### IV. The Public Interest Favors Entry of a Preliminary Injunction Against Defendants.

The injunctive relief that Plaintiffs seek is reasonably tailored to protect their legitimate interests in their trademarks, goodwill, and control over the nature and quality of their products. *See Universal City Studios v. Mueller Chemical Co.*, 1982 U.S. Dist. LEXIS 16051 at **27-28 (N.D. Ill. 1982). Indeed, the public interest is best served by granting injunctive relief to protect businesses' intellectual property rights. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) (holding "damages occasioned by trademark infringement are by their very nature irreparable…in part from the realization that the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods"). Moreover, public policy favors injunctive relief because enforcement of trademark laws prevents customer confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *see also A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir. 1982); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d at 1092.

Entry of a preliminary injunction in this case serves the public interest by preventing the sale and distribution of products which pose a serious and substantial risk of personal injury or property damage to unsuspecting consumers. The counterfeit electrical components which Defendants have sold may fail catastrophically and result in serious injury to consumers. (Miller Aff., Ex. B, at ¶¶ 5-6). Entry of a preliminary injunction will help ensure that only authentic Square D and Schneider Electric products are introduced into the market, thereby ensuring that consumers will not face safety hazards from counterfeit products.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request that their motion for preliminary injunction be granted.

Dated:  January 22, 2008                                     Respectfully submitted,


                                                                             **/s/ Christopher T. Sheean**
                                                                             Brian W. Lewis (ARDC#6190792)
                                                                             Christopher T. Sheean (ARDC#6210018)
                                                                             WILDMAN, HARROLD, ALLEN & DIXON LLP
                                                                             Attorneys for Plaintiffs
                                                                             Suite 2800
                                                                             225 West Wacker Drive
                                                                             Chicago, Illinois 60606
                                                                             Telephone No. (312) 201-2000
                                                                             Facsimile No. (312) 201-2555