IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SQUARE D COMPANY and SCHNEIDER ELECTRIC, S.A., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO.: 07 C 6294 |
| ELECTRONIC SOLUTIONS, INC., and WILLIAM AMBROS, | ) ) ) ) | Judge James B. Moran |
| Defendants. | ) | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO AWARD SANCTIONS**

Plaintiffs Square D Company ("Square D") and Schneider Electric, S.A. ("Schneider") (collectively "Plaintiffs") learned in August 2007 that Defendants had sold counterfeit electrical contactors bearing Plaintiffs' trademark, "Telemecanique," "Schneider Electric" and "Square D." Based on this information, Plaintiffs filed the instant suit. Following service on the defendants, Plaintiffs' counsel sought to work out a consensual resolution of this dispute, and reached agreement with Defendants' prior counsel on the Agreed Consent Order. Pursuant to the Consent Order, Plaintiffs agreed not to sell any products bearing Plaintiffs' trademarks (the "Products") until completion of the inspection, and Plaintiffs would be permitted to inspect the Products in Defendants' possession. However, following entry of the order, Plaintiffs' counsel discovered that Defendants were actively marketing and selling the Products on several websites and an E-bay website, and that the products Defendants offered for sale far exceeded the items identified in Defendants' inventory list provided to Plaintiffs.

Plaintiffs' counsel confronted Defendants' counsel with evidence of additional sales, and the parties agreed that Defendants would cease any further sales and provide Plaintiffs' counsel with paper and electronic copies of all purchases and sales of the Products from January 1, 2006

to the present. Based on representations that Defendants would act in good faith, provide the purchase and sales records as well as access to the computers Defendants used to conduct their business, Plaintiffs went ahead with the planned inspection and arranged for two engineers and a computer forensics technician to travel to Defendants' warehouse for the inspection. The inspection proved to be a complete waste of time, and as a result of Defendants' complete lack of good faith, Plaintiffs incurred over $12,000 in fees and expenses for no reason.

Defendants have chosen to replace their counsel, but now seem to ignore completely the agreements and communications their prior counsel had with Plaintiffs' counsel. Defendants Rather, Defendants offer only a partial description of the communications between the parties, in an effort to give the appearance that their disregard of this Court's Consent Order and the agreements worked out between counsel were innocent miscommunications. However, the correspondence between the parties reveals that Defendants were aware of their violations of the Consent Order, and that Defendants intentionally misled Plaintiffs into believing they would be given full and complete access to Defendants' inventory and records. This court has the authority and discretion to award sanctions as a result of Defendants' contumacious behavior, and such sanctions are clearly appropriate here.

1. **Defendants' Disregarded The Agreed Consent Order And Sold Products Bearing Plaintiffs' Trademarks.**

Defendants claim that any perceived violation of the Agreed Consent Order is purely a matter of a miscommunication between counsel for the parties. This claim, however, is belied by the very exhibits Defendants attached to their response brief. The Agreed Consent Order states very clearly that Defendants were to refrain from selling any products bearing Plaintiffs' trademarks until the inspection was completed. (Ex. A to Plaintiffs' Motion to Open Discovery). Plaintiffs' counsel first raised Defendants' violation of the order in a March 19, 2008 letter to

Defendants' counsel, requesting that Defendants' counsel "instruct Mr. Ambros to cease all sales activities of [the Products]."  (A copy of the March 19, 2008 letter is attached as Exhibit 1).  On April 14, 2008, Plaintiffs' counsel forwarded a second letter to Defendants' counsel regarding Defendants' violation of this provision of the order, and demanding that Defendants explain their violation.  In their response brief, Defendants claim that they were told by their prior counsel that they could sell the prohibited products despite the court order.  This is not a miscommunication between counsel, but between Defendants' counsel and Defendants.

Compounding the problem, despite a clear acknowledgement by Defendants as of April 16, 2008 that the Agreed Consent Order prohibited Defendants from selling products bearing Plaintiffs' trademarks until the pending inspection was fully completed, Defendants continued to sell these same products right through April and May, 2008.  (See Ex. D to Plaintiffs' Motion to Open Discovery).  Clearly these sales cannot be explained away as the result of some miscommunication.  Rather, they are clear evidence of Defendants' complete and utter disregard for Plaintiffs' intellectual property rights and this Court's authority.

Defendant Ambros claims in his affidavit that he understood the Consent Order to only restrict sales of "Square D" products until February 29, 2008, the date of the original inspection, despite the clear language in the order which states that the date for the inspection could be adjusted by the parties.  Even if Mr. Ambros did believe he was only prohibited from selling the Products through February 29th, his actions show that he violated his own tortured construction of the Consent Order.  A review of the feedback for sales made by Mr. Ambros in February 2008 show that he continued to sell what he terms "Square D" products without interruption throughout the month of February 2008.  (A printout of the feedback for the Ambros Ebay

website is attached as Exhibit 2). Mr. Ambros did not even slow down, let alone stop selling the products this court ordered him to stop selling.

**2.     Defendants Misled Plaintiffs' Counsel By Failing To Provide At The Inspection The Previously Promised Purchase And Sale Records.**

Plaintiffs' request for all records of purchases and sales of products bearing Plaintiffs' marks came on March 19, 2008, following the discovery that Defendants were offering 144 separate groups of items for sale, most of which were identified as Plaintiffs' trademarked products. (Ex. 1, March 19, 2008 letter). Upon discovering Defendants' ongoing and continuous sales of products bearing their trademarks, Plaintiffs recognized the need not only to inspect Defendants' inventory, but also the need to review the books and records of Defendants' purchases and sales. Plaintiffs' counsel immediately wrote a letter to Defendants' counsel requesting that the records be provided at the inspection.

Defendants paint a far from complete picture in attempting to cloak Defendants' actions in a veil of innocence. Defendants cite an email dated April 11, 2008 from Defendants' former counsel (Ex. G to Defendants' Response) to support its contention that Defendants refused to produce any books and records absent a protective order. However, Defendants ignore the subsequent discussions between the parties, as memorialized in Exhibit B to Defendants' Response, an April 16, 2008 letter from Defendants' prior counsel wherein Mr. DiMonte states that he asked his client "to gather up the records to show what Square D merchandise has been sold between February 29th and April 30th. . . All Square D orders filled since February 29th have been filled with merchandise he purchased from other vendors. **You will see these records when you perform the inspection.**" (Ex. B to Defendants' Response Brief). Based on this statement two weeks before the inspection, Plaintiffs' counsel certainly had every reason to understand and expect it would see these records at the inspection.

Defendants also ignore the telephonic conversations that occurred between the parties subsequent to that letter, as memorialized in the April 24, 2008 letter from Plaintiffs' counsel to Defendants' counsel. (A copy of the April 24, 2008 letter is submitted herewith as Exhibit 2). In that letter, Plaintiffs' counsel states "Pursuant to the terms of our discussions and agreement . . . your clients will provide copies of records of all purchases, sales and/or referrals for any and all products marked and/or described with the marks "Telemecanique," "Schneider Electric," "Square D," and/or "Merlin Gerin," since January 1, 2006. Subsequent to sending that letter, Plaintiffs' counsel received no telephone call or correspondence indicating Defendants would not produce the records of purchases and sales.

**3.    The Parties Understood And Agreed That Defendants Would Produce The Computer Housing Defendants' Electronic Purchase And Sale Records.**

Given the repeated difficulties that Plaintiffs' counsel encountered in seeking to verify the scope and extent of Defendants' sales of products bearing Plaintiffs' marks, Plaintiffs deemed it necessary not only to review any paper copies of records of purchases and sales, but also to obtain an image of the hard drive of the computer Defendants used in operating their internet business. After all, Plaintiffs' investigation revealed that Defendants operated numerous websites offering electronic products such as those bearing Plaintiffs' marks, including www.electronicsolutions.com, www.sourceautomation.com, and www.pushbuttonsdirect.com, despite the fact that Defendants have never been authorized distributors for any of Plaintiffs' products. Similarly, Defendants offered hundreds of products for sale on E-bay under the aliases of 123Ambros and 1978Euclid. (See Ex. D. to Plaintiffs' Motion to Open Discovery). As such, Plaintiffs requested and Defendants agreed to produce the computers used for transacting the online computer business, and allow Plaintiffs to have an image made of the computers' hard drives to preserve the evidence. This agreement was again reached via telephone between the

1821233-2                                         5

parties, and confirmed in the April 29, 2008 uncontradicted email from Plaintiffs' counsel to Defendants' former counsel (Ex. G to Defendants' Response Brief).

Based on the agreement with Defendants' former counsel that Defendants' computers would be available for imaging, Plaintiffs' engaged a computer forensics technician to travel to Plant City, Florida and conduct the computer imaging at a cost of $2,271.50. As discussed at length in Plaintiffs' Motion to Open Discovery, Plaintiffs relied upon Defendants' counsel's representation that the computers Defendants used to conduct their online businesses would be available for inspection and imaging, and the laptop that was provided had records dating from 2004 and earlier, and wholly unrelated to the sales of the subject products. Equity demands that Defendants pay for the expenses Plaintiffs incurred in conducting an inspection that Defendants made sure was a complete waste of time.

As a housekeeping matter, Defendants concede in their response brief that they will produce paper and electronic copies of the purchase and sale records Defendants' counsel previously agreed to produce at the inspection. However, Defendants have not specified when said records will be produced. As such, Plaintiffs simply request that the Court set a date certain by which Defendants will produce all paper and electronic records of all purchases and sales that Defendants and Defendants' affiliated companies made of products bearing the trademarks "Square D," "Scheider Electric," "Telemecanique" or "Merlin Gerin," from January 1, 2006 to the present.

## Conclusion

Plaintiffs sought to reach a consensual resolution with Defendants, and in good faith, traveled to Defendants' warehouse in Plant City, Florida with two of Plaintiffs' engineers and a computer forensics technician in order to conduct a comprehensive review of all of Defendants'

inventory, books and records, in hopes of being able to conclude this litigation swiftly and inexpensively.  In complete and utter disregard for the agreement between the parties and the Consent Order entered by this Court, Defendants failed to produce any of the products identified as being offered for sale and/or recently sold, failed to produce the paper books and records of purchases and sales of the Products, and failed to produce the computers Defendants used to conduct their internet business of marketing and selling electrical products.  Plaintiffs incurred significant expenses totaling in excess of $12,000 as a result of Defendant's failure to comply with the Consent Order and the agreements reached between counsel for the parties.  This Court should award Plaintiffs' their fees and expenses incurred in conducting the inspection.

Dated: July 11, 2008                    Respectfully submitted,


                                        **/s/ Christopher T. Sheean**
                                        Christopher T. Sheean (ARDC#6210018)
                                        WILDMAN, HARROLD, ALLEN & DIXON LLP
                                        Attorneys for Plaintiffs
                                        Suite 2800
                                        225 West Wacker Drive
                                        Chicago, Illinois 60606
                                        Telephone No. (312) 201-2997
                                        Facsimile No. (312) 416-4659

## **CERTIFICATE OF SERVICE**

Christopher T. Sheean, an attorney, hereby certifies that he caused a true and correct copy of the foregoing **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF ITS MOTION TO AWARD SANCTIONS** to be served on all parties of record via CM/ECF. on the 11th day of July, 2008.

                                                  /s/Christopher T. Sheean

Christopher T. Sheean (ARDC#6210018)
WILDMAN, HARROLD, ALLEN & DIXON LLP
Attorneys for Plaintiffs
Suite 2800
225 West Wacker Drive
Chicago, Illinois 60606
Telephone No. (312) 201-2997
Facsimile No. (312) 416-4659